IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DANNY T. McCARTHY                                              PLAINTIFF

                    v.                    Civil No. 05-5197

DR. NEIL MULLINS;
NURSE SUE; SHERIFF
FERGUSON; MAJOR DRAKE;
CAPTAIN PETRAY; and THE
DETENTION GUARDS, All
Three Shifts                                                  DEFENDANTS


**<u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>**

Before the undersigned for report and recommendation is the defendants' motion for

summary judgment motion (Doc. 20).  To assist plaintiff in responding to the summary judgment

motion, a questionnaire was propounded to the plaintiff  (Doc. 32).  Plaintiff's response to the

questionnaire was filed as his response to the summary judgment motion (Doc. 33).

Plaintiff contends his constitutional rights were violated while he was incarcerated at the

Benton County Detention Center in 2005.  Specifically, he contends:  (1) he was denied adequate

medical care; (2) he was not allowed to worship or attend Bible study; and (3) he was subjected

to unconstitutional conditions of confinement.  With regard to the conditions he was confined

under, plaintiff asserts he was forced to suffer cold temperatures, not given an adequate diet,

threats were made against him, he was subjected to racial remarks, he was not provided clean

clothing and allowed to shower frequently enough, he was not allowed outside recreation, and

he was not allowed to change clothing or shower after he had seizures.

-1-

Although defendants' motion for summary judgment (Doc. 20) mentions plaintiff's claim that he was not allowed to worship or go to his Bible study group, defendants' statement of indisputable material facts (Doc. 22) and brief (Doc. 21) do not address this claim. We will therefore treat defendants' motion as a motion for partial summary judgment on the denial of adequate medical care claim and the unconstitutional conditions of confinement claim.

## **BACKGROUND**

Danny McCarthy was arrested on February 1, 2005, on a hold from the United States Marshal Service. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1 at page 1. He was booked into the Benton County Detention Center (BCDC) either that day or the following day. *Defts' Ex.* 1 at page 2; *Plaintiff's Response* (hereinafter *Resp.*) at ¶ 1.

He was held at the BCDC until April 4, 2005, when he was released to the Marshal Service and transferred to the Federal Correctional Institution in Waseca, Minnesota. *Addendum* (Doc. 10) at ¶ 1; *Defts' Ex.* 1 at page 13. He returned to the BCDC on June 24, 2005, and remained there until his release on December 12, 2005. *Defts' Ex.* 1 at pages 29 & 55.

McCarthy was being held at the BCDC solely because of pending criminal charges. *Resp.* at ¶ 2. According to defendants' records, McCarthy was arrested on February 2, 2005, at Hot Springs Federal Court and a note was made on his criminal intake form to use caution because he had a violent history. *Defts' Ex.* 1 at page 3. McCarthy, however, contends that he was arrested at home and taken to the Garland County Jail. *Resp.* at ¶ 3. McCarthy further maintains he does not have a violent history. *Id.*

-2-

As part of McCarthy's intake, a medical questionnaire was completed. *Resp.* at ¶ 4.  He indicated he had seizures due to epilepsy, allergies, asthma, and tuberculosis.  *Id.*  He also indicated he had back surgery eighteen months before and had a metal plate in his head.  *Id.*

McCarthy was given a list of detainee rules which he signed. *Defts' Ex.* 1 at page 5.  He was given an inmate telephone system notice and signed the notice.  *Resp.* at ¶ 6.  McCarthy was issued a uniform, a foam mat, and a towel.  *Resp.* at ¶ 9.

A booking check list was completed by Sgt. Nance.  *Defts' Ex.* 1 at page 7.  McCarthy's personal property was listed and he signed the list of property.  *Id.* at page 8.

Although the list did not show any prescription medications, *defts' ex.* 1 at page 8, McCarthy contends his medications were taken with him from his home by the Federal Bureau of Investigation (FBI) when he was arrested and given to the transporting officers who took him to the BCDC, *resp.* at ¶ 8(B).  Specifically, McCarthy contends the following medications were brought with him:  Dilantin for seizures; Aerobid and Combivent for asthma; calcium; Absorbase for agent orange; multiple vitamins, Trazodone for back pain; Cyclobenzoprine for his back; Renitidine for his stomach; artificial tears so his left eye wouldn't dry out; and Fenobarb for seizures.  *Resp.* at ¶ 8(C).  McCarthy indicates all medications were prescribed by the Veteran's Administration (VA) Hospital in Little Rock, Arkansas.  *Id.*

On February 3, 2005, McCarthy was seen by Dr. Mullins.  *Defts' Ex.* 1 at page 9; *Resp.* at ¶ 10.  When Dr. Mullins told McCarthy that he did not have any sign of asthma, or if he had some it was very mild, he began to argue with Dr. Mullins and said to just throw his medicine away and put it all in a box and he would talk to the U.S. Marshal.  *Id.*  According to McCarthy, Dr. Mullins never examined him and did not take an x-ray.  *Resp.* at ¶ 10.

-3-

Dr. Mullins also noted that McCarthy's back pain was questionable. *Defts' Ex.* 1 at page 9. However, McCarthy states Dr. Mullins never touched McCarthy or looked at his back. *Resp.* at ¶ 11. Had Dr. Mullins examined him, McCarthy states Dr. Mullins would have seen a six inch scar on McCarthy's lower back from an operation. *Resp.* at ¶ 11.

Dr. Mullins indicated McCarthy came to the jail with the following medications: Aerobid, Combivent inhaler, Dilantin, Calcium, Absorbase ointment, Guaifunesin, Ducosate, Multiple Vitamin, Trazodone, Cyclobenzaprine or Flexeril, Renitidine, Artificial tears, and Fenobarb. *Defts' Ex.* 1 at page 10; *Resp.* at ¶ 13.

Dr. Mullins prescribed McCarthy Dilantin, Fenobarb, and Combivent. *Defts' Ex.* 1 at pages 9 & 10. Dr. Mullins also indicated McCarthy would be given 500 mg. of Calcium a day. *Id.* Dr. Mullins believed McCarthy was over medicated. *Id.* Dr. Mullins stated they would follow McCarthy closely. *Id.*

According to McCarthy, he never received the Calcium or Dilantin but did receive 800 mg. of Fenobarb. *Resp.* at ¶ 12. Although McCarthy was told by Dr. Mullins that he believed McCarthy was over-medicated, McCarthy maintains Dr. Mullins never did anything to correct it. *Id.*

On February 7, 2005, McCarthy was released into the custody of the U.S. Marshal at 7:58 a.m. for court and brought back to the BCDC at 7:07 p.m. *Defts' Ex.* 1 at page 13; *Resp.* at ¶ 14. According to defendants' records, on February 7, 2005, a chemical analysis was done on McCarthy's blood to check his Dilantin level. *Defts' Ex.* 1 at page 15. McCarthy, however, contends he never had a blood test. *Resp.* at ¶ 15.

-4-

When McCarthy was brought back to the BCDC by the Marshal Service, a criminal intake from was completed by Deputy Lisenbee, a medical intake form was completed, and McCarthy was given a notice regarding the inmate telephone system which he signed. *Defts' Ex.* 1 at pages 16-18.

On February 17, 2005, McCarthy submitted a request asking to be put in general population instead of administrative segregation. *Defts' Ex.* 1 at page 21. Lt. Carter responded that he would remain in his current housing status. *Id.*

On March 29, 2005, McCarthy submitted a grievance complaining that he hadn't been receiving any mail. *Resp.* at ¶ 21. Captain Petray responded that he would check into it. *Id.*

On April 12, 2005, McCarthy signed a release so the BCDC could provide his medical records to the Federal Correctional Institution in Waseca, Minnesota. *Resp.* at ¶ 22(A). On April 19, 2005, the medical release was faxed to the U.S. Department of Justice. *Defts' Ex.* 1 at pages 24 & 26. On May 19, 2005, a fax was sent by Dr. Sheila Brandt, a forensic psychologist, asking for McCarthy's medical records. *Id.* at page 27. A second fax was sent by Dr. Brandt on June 2, 2005. *Id.* at page 28.

On June 24, 2005, according to defendants, McCarthy was arrested at the Ft. Smith Federal Courthouse on a U.S. Marshal hold. *Defts' Ex.* 1 at page 29. Defendants indicate McCarthy was arrested and transported by Deputy Skourup. *Id.* McCarthy indicates he was transferred from a federal center in Oklahoma. *Resp.* at ¶ 23.

A medical questionnaire was completed and McCarthy indicated he had asthma, suffered seizures, had back problems, and wore a TENS unit. *Resp.* at ¶ 24. On June 24, 2005, a U.S. Department of Justice notice stated that McCarthy was to wear a TENS unit for his back and that

-5-

he was also on various medications. *Resp.* at ¶ 25.  The notice was received by Deputy Daniel Skourup.  *Id.*  A note was also made that McCarthy had requested medical confinement.  *Id.* McCarthy asserts that he never requested medical confinement.  *Id.*

On June 27, 2005, McCarthy was seen by Dr. Mullins. *Defts' Ex.* 1 at page 37; *Resp.* at ¶ 26.  Dr. Mullins noted McCarthy's lungs had no spasms compatible with asthma when Dr. Mullins examined McCarthy.  *Id.*  When Dr. Mullins attempted to do a straight leg raising test, according to Dr. Mullins' records, McCarthy got mad at Dr. Mullins and started yelling at him for causing McCarthy pain.  *Id.*  According to McCarthy, Dr. Mullins never put his hands on McCarthy.  *Resp.* at ¶ 26.

Dr. Mullins noted that McCarthy's complaints far exceeded the physical findings. *Defts' Ex.* 1 at page 37.  Dr. Mullins indicates he told McCarthy to come back when he would let Dr. Mullins examine him properly without complaining and yelling at him.  *Id.*

McCarthy denies that Dr. Mullins ever told him to come back. *Resp.* at ¶ 27.  As noted above, McCarthy contends Dr. Mullins never examined him.  *Id.*  Further, McCarthy asserts that Dr. Mullins never even tried to get McCarthy's medical records from the VA Hospital in Fayetteville.  *Id.*

Dr. Mullins okayed McCarthy's use of Ipratropim, two puffs, four times a day, Beclomye, an Albuterol inhaler, Phenyltin, Ibuprofen, and his TENS unit. *Defts' Ex.* 1 at page 37.  Dr. Mullins noted that McCarthy was going to be at the detention center for only one week and would be observed.  *Id.*  Since he had not been to court, McCarthy maintains Dr. Mullins could not have believed he was only going to be at the detention center for one week. *Resp.* at ¶ 28.

-6-

According to defendants' records, on July 10, 2005, Deputy T. Lee reported that at 7:30 a.m. he went to the nurse's station to give McCarthy his medication and he refused the medication saying it was making him feel worse. *Defts' Ex.* 1 at page 38. Lee indicated he asked McCarthy to sign the medication sheet and he refused. *Id.* McCarthy maintains the guards simply forgot to give him his medication on this date. *Resp.* at ¶ 29.

On July 19, 2005, McCarthy was seen by Nurse McDonald. *Resp.* at ¶ 30. He was complaining of a rash on his face. *Id.* He was given hydrocortisone cream. *Id.*

McCarthy indicates the cream did not help. *Resp.* at ¶ 30. Although he told Nurse McDonald the cream was not helping, McCarthy states he had to wait until he was released to go to the VA Hospital. *Id.* The VA determined it was a fungus "which came from using [the] same razor that [forty] other[s] had used." *Id.*

On August 19, 2005, McCarthy requested release of his medical records. *Defts' Ex.* 1 at page 39. Lt. Carter responded in writing by asking if McCarthy wanted the records or if he wanted them sent to someone. *Id.* Lt. Carter stated that any court information McCarthy needed was public record but his medical records required a subpoena for anyone to get. *Id.*

According to McCarthy, he was told that he could not have his medical records. *Resp.* at ¶ 31. Instead, he was told only his lawyer could have them. *Id.* McCarthy states he told his lawyer this. *Id.*

On September 11, 2005, McCarthy asked that his cell remain unlocked until bedtime since he and the other inmates got along with one another. *Defts' Ex*. 1 at page 40; *Resp.* at ¶ 32. Lt. Carter responded that McCarthy would remain on his current housing status. *Id.*

-7-

On November 8, 2005, McCarthy submitted a request for medical treatment because of an eye lid infection. *Defts' Ex.* 1 at page 44; *Resp.* at ¶ 33(A). On November 9, 2005, McCarthy submitted a second request for medical treatment for an eye lid infection. *Defts' Ex.* 1 at page 45; *Resp.* at ¶ 33(B).

On November 10, 2005, McCarthy was seen by Dr. Mullins. *Defts' Ex.* 2 at page 1; *Resp.* at ¶ 33(C). Dr. Mullins' records indicate he examined McCarthy's eye and didn't see much at all. *Defts' Ex.* 1 at page 46. Dr. Mullins indicated McCarthy might have a little infection in it. *Id.* He prescribed eye drops for seven days. *Id.* According to McCarthy, Dr. Mullins never looked at his eye. *Resp.* at ¶ 33(D).

According to Dr. Mullins' records, he also listened to McCarthy's lungs. *Defts' Ex.* 1 at page 46. Dr. Mullins indicated McCarthy's lungs were clear and normal. *Id.* Dr. Mullins discontinued two of McCarthy's inhalers for asthma and continued him on the Albuterol. *Id.* Dr. Mullins was going to recheck McCarthy in a week and if his lungs were clear take his off the Albuterol. *Id.* Dr. Mullins believed medication was being abused. *Id.* According to McCarthy, Dr. Mullins never touched him. *Resp.* at ¶ 33(E).

On November 17, 2005, Deputy Sharp did a cell inspection and found an extra blanket, book, and pencil in McCarthy's cell. *Defts' Ex.* 1 at page 47. McCarthy was locked down for concealing items from jail staff. *Id.*

McCarthy does not deny he was found with these items. *Resp.* at ¶ 34. Instead, he contends Sharp is the one that gave him the extra blanket and pencil. *Id.*

On November 17, 2005, McCarthy submitted a grievance complaining about being locked down and being discriminated against. *Defts' Ex.* 1 at page 51; *Resp.* at ¶ 39. McCarthy

-8-

indicated he found the extra blanket and picked up the extra book off the floor during dinner. *Id.* He stated he had been given the pencil by the day guard. *Id.*

In response, Captain Petray stated that no one was being racist towards McCarthy and that all inmates are required to obey the rules. *Defts' Ex.* 1 at page 51. McCarthy states he was the only detainee not allowed out with the others and the only detainee not allowed to talk to other persons. *Resp.* at ¶ 40.

On November 18, 2005, McCarthy submitted a grievance complaining that each inmate had something extra that was confiscated during the cell search. *Resp.* at ¶ 35. McCarthy stated he and Fox were the only two placed on ten day lock-down. *Id.*

The grievance contains a written response dated November 21, 2005, and signed by Captain Petray. *Defts' Ex.* 1 at page 49. The response states that all inmates will obey the rules of the jail. *Id.* McCarthy contends he was told nothing in response to his grievance. *Resp.* at ¶ 36.

Defendants' records indicate McCarthy received a disciplinary hearing on November 17, 2005, and was found guilty of concealing items from jail staff. *Defts' Ex.* 1 at page 50. McCarthy was given ten days lock-down and loss of privileges. *Id.*

McCarthy asserts he never received a hearing. *Resp.* at ¶ 37. Defendants' records indicate McCarthy appealed the decision and the decision was affirmed based on his admission. *Defts' ex.* 1 at page 50. McCarthy maintains he did not admit anything because he was never asked anything. *Resp.* at ¶ 38.

On November 22, 2005, McCarthy refused to see Dr. Mullins. *Defts' Ex.* 2 at page 1; *Resp.* at ¶ 41. McCarthy asks why he would want to keep "seeing someone that didn't care about

my health." *Id.*  It is also McCarthy's  belief that Dr. Mullins provided inadequate medical care to McCarthy's wife while she was incarcerated at the BCDC.  *Resp.* at ¶ 41.

On November 23, 2005, McCarthy submitted a medical request asking for a meatless diet. *Defts' Ex.* 1 at page 52; *Resp.* at ¶ 42.  He indicates he made this request because all the cold-cuts he was receiving were making him sick.  *Id.*

In response, Nurse McDonald stated a meatless diet would not provide McCarthy with enough protein. *Defts' Ex.* 1 at page 52; *Resp.* at ¶ 43.  McCarthy, however, contends the cold-cuts did not provide enough protein and that peanut butter has twice the protein.  *Id.*

On November 28, 2005, McCarthy submitted a medical request stating that the black hair on the left side of his face was disappearing.  *Defts' Ex.* 1 at page 52; *Resp.* at ¶ 44.  McCarthy requested that an antibiotic be prescribed.  *Id.*

In response, McCarthy was put on the list to see Dr. Mullins.  *Defts' Ex.* 1 at page 53. McCarthy refused to see Dr. Mullins.  *Id.  See also Resp.* at ¶ 46.  According to McCarthy, Dr. Mullins had "never cared" in the almost ten months McCarthy had been detained so "why see him." *Resp.* at ¶ 46.

On December 12, 2005, McCarthy was released for time served pursuant to the U.S. Marshals. *Defts' Ex.* 1 at page 55; *Resp.* at ¶ 47.  According to the medication logs, McCarthy received Dilantin beginning on February 3, 2005, and received it while at the BCDC until his release on December 12, 2005.  *Defts' Ex.* 2.  McCarthy, however, asserts, without reference to the medication logs, that he did not receive the Dilantin until he returned from Waseca.  *Resp.* at ¶ 48(A).  McCarthy does not offer any explanation for why his initials appear to be on the medication logs beginning on February 3, 2005, as having received Dilantin.  *Id.*

-10-

McCarthy received Ibuprofen for relief of pain. *Defts' Ex.* 2; *Resp.* at ¶ 48(B).  McCarthy also received the prescribed inhalers. *Defts' Ex.* 2; *Resp.* at ¶ 48(C).

All decisions about McCarthy's medical care while he was at the BCDC were made by the jail medical personnel, Dr. Neil Mullins and Nurse Sue McDonald. *Resp.* at ¶ 49.  McCarthy contends Dr. Mullins was deliberately indifferent to McCarthy's serious medical needs. *Resp.* at ¶ 51.  Specifically, McCarthy contends Dr. Mullins failed to request his medical records and did not order an x-ray or blood tests. *Id.*  If Dr. Mullins had obtained the medical records, McCarthy states Dr. Mullins would have known McCarthy has grand mal seizures and has been a disabled veteran since 1972. *Id.*

McCarthy also contends Nurse McDonald was deliberately indifferent to his serious medical needs. *Resp.* at ¶ 52.  McCarthy contends he knows Nurse McDonald observed him having seizures a couple of times but did nothing to help. *Id.*

McCarthy did not submit any written grievances about not being allowed to worship or go to his Bible study group.  However, he contends he spoke to the guards and Lt. Carter and was told that no Roman Catholics came to the BCDC. *Resp.* at ¶ 53.

McCarthy asserts he was not allowed out of his cell to attend church services. *Resp.* at ¶ 54.  He indicates he was not allowed any religious materials and was not allowed to meet any religious leaders. *Id.* at ¶ 55.

McCarthy submitted no written grievances about the diet at the BCDC being inadequate.  However, he contends he spoke to the guards, Lt. Carter, and Captain Petray and was told to eat the food or not. *Resp.* at ¶ 57(A).  McCarthy received cold cuts and cold food three times a day.

-11-

*Resp.* at ¶ 57(B).  According to him, what he received did not constitute meals.  *Id.*  He contends

he had nothing to drink but water because he is allergic to milk.  *Id.*

McCarthy asserts that eating nothing but cold-cuts and cold food is not healthy.  *Resp.*

at ¶ 57(C).  Moreover, McCarthy states he has stomach problems.  *Id.*

McCarthy was asked whether he had a bunk or a mattress to sleep on and a blanket.

*Resp.* at ¶ 58.  He responded:  "No."  *Id.*  However, he then said he had a two inch foam mat.

*Id.*

McCarthy was provided with basic hygiene items such as soap and water and was

allowed to shower.  *Resp.* at ¶ 59.  According to McCarthy, whether he was allowed to shower

on a regular basis depended on whether the guards remembered to let him out of his cell.  *Id.*

Similarly, McCarthy stated he was provided with clean clothing if the guards remembered.  *Id.*

at ¶ 60.

McCarthy asserts he was having four to six grand mal seizures a week with each seizure

lasting five to ten minutes.  *Resp.* at ¶ 65(C).  He indicated he was locked in a cell by himself so

there was no one to tell when he had a seizure.  *Id.*  According to McCarthy, the medical staff

did not care if he lived or died.  *Id.*

McCarthy did not submit any written grievances about not receiving clean clothing or

being allowed to take a shower after he had a seizure.  *Resp.* at ¶ 65(A).  However, he indicated

he spoke to the guards and Lt. Carter and was told he could only change clothes on Tuesday,

Thursday, and Saturday.  *Id.*

-12-

McCarthy did not submit a medical request asking that he be allowed to change clothes or shower after he had a seizure. *Resp.* at ¶ 65(B). However, McCarthy contends the medical staff had shown they did not care. *Id.*

McCarthy does not contend there was insufficient room in his cell to do exercises such as push-ups and sit-ups. *Resp.* at ¶ 61. However, he maintains the cell was too "cold to walk on." *Id.*

While McCarthy does not argue that he submitted any written grievances regarding the temperature in his cell, he does state that he complained everyday. *Resp.* at ¶ 62. Specifically, he states he complained to the guards, Lt. Carter, Captain Petray and Nurse McDonald and the only response he received was laughter. *Id.* When asked whether he had suffered any physical injury as a result of the temperature at which his cell was maintained, McCarthy responded that arthritis has set up in his lower back. *Resp.* at ¶ 63.

McCarthy was asked to describe how each of the defendants threatened or discriminated against him. *Resp.* at ¶ 64. He indicated Dr. Mullins never examined him and did not send for his medical records from the VA. *Id.* McCarthy stated Nurse McDonald did not care about his medical needs and wouldn't look at him. *Id.*

With respect to Major Gene Drake, McCarthy stated Drake allowed the guards to treat McCarthy "anyway" and to do what they wished to. *Resp.* at ¶ 64 & ¶ 67. McCarthy indicated Captain Petray showed McCarthy and told him that he didn't care about McCarthy as a person. *Id.* at ¶ 64. McCarthy contends Petray knew what was going on and did nothing. *Id.* at ¶ 68. Further, McCarthy asserts Petray threatened McCarthy with bodily harm, stopped McCarthy's mail, failed to inform McCarthy when his wife was rushed to the hospital, and would not let

-13-

McCarthy communicate with his wife. *Id.* McCarthy indicates Petray did allow his guards to tell McCarthy that his wife had died. *Id.*

McCarthy was also asked to describe in detail how he believed Sheriff Ferguson violated his federal constitutional rights. *Resp.* at ¶ 66. McCarthy responded: "He allowed his staff to mistreat me, threaten me with bodily harm; to be called nigger, keep me on lock down." *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

-14-

## DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that each defendant acted under color of state law and that he or she violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).  Mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

As noted above, McCarthy was a pretrial detainee.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."  Although the same standard of culpability applies, we will address the denial of medical care claim and the unconstitutional conditions of confinement claims separately.

### *Denial of Adequate Medical Care*

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429

-15-

U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

-16-

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment.  Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239.  *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

The records establish McCarthy received, among other things, Dilantin, his inhalers, and Ibuprofen for pain. He was seen by Dr. Mullins and/or Nurse McDonald on several occasions and refused to see Dr. Mullins on at least two occasions. *Resp.* at ¶ 41 & ¶ 46.

Although  McCarthy does not believe he was properly evaluated or received the proper medical treatment,  it is undisputed that McCarthy received medical attention on multiple occasions and his requests for medical treatment were evaluated by medical personnel. McCarthy received all medical care ordered by the medical personnel who treated him.  A difference of opinion between McCarthy and the medical personnel who treated him regarding his treatment or the necessity of his being prescribed certain medication does not give rise to a § 1983 claim. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(mere disagreement with the course of medical treatment is insufficient to state an Eighth Amendment claim).  Moreover, McCarthy has presented no evidence that any delay in his receiving prescription medications, or the fact that Dr. Mullins took him off certain prescription medications, had any detrimental impact on his health. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)(inmate who complains about delay in medical treatment must present verifying medical evidence of

-17-

detrimental effect of delay).  We find there are no genuine issues of material fact as to whether Dr. Mullins and Nurse McDonald were deliberately indifferent to McCarthy's serious medical needs.

With respect to Sheriff Ferguson, Major Drake, and Captain Petray, "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir. 1990).  In this case, there is no indication Sheriff Ferguson, Major Drake, or Caption Petray made any decisions regarding McCarthy's medical care or the medication he should be prescribed.  Instead, all treatment decisions were made by Nurse McDonald and/or Dr. Mullins.  *See also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence the defendants were medical personnel or were personally involved in making medical decisions about the plaintiff's treatment); *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)(section 1983 liability requires personal involvement, or allegation that supervisor had knowledge of unconstitutional conduct and turned blind eye to it).

### *Conditions of Confinement*

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

-18-

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875.

The Supreme Court has stated that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). However, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise–for example, a low cell temperature at night combined with a failure to issue blankets." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)(*citing Wilson*, 501 U.S. at 304). The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

-19-

### (a). *Shower & Changes of Clothing*

McCarthy contends his rights were violated when he was not allowed to shower or change clothing after he had a seizure. Additionally, he contends the guards would forget to give him an opportunity to shower and/or would forget to provide him with a change of clothing on the scheduled days.

In his addendum, McCarthy indicated he was allowed out of his cell each day to wash his body and his cell. *Addendum* (Doc. 10) at ¶ 9. He also indicated he was allowed to change his whites each day and his uniform on Tuesdays, Thursdays, and Saturday. *Id.* at ¶ 12. In responding to the summary judgment motion, McCarthy indicated he was allowed to shower three times a week and received a change of clothing three times a week unless the guards forgot to provide him with the opportunity. *Resp.* at ¶ 59, ¶ 60, & ¶ 65(A). McCarthy did not indicate how frequently the guards forgot to offer him this opportunity. *Id.*

Although McCarthy indicates he verbally asked to be able to change clothing whenever he had a seizure, nothing in the record before the court substantiates this assertion. *Resp.* at ¶ 65(A). McCarthy submitted numerous written grievances and medical requests while incarcerated at the BCDC and not a single one mentions his need to change clothing or shower after having a seizure. There is nothing in the McCarthy's medical records indicating he made this request.

Quite simply there is no genuine issue of material fact as to whether McCarthy was deprived of "a single, identifiable human need, such as food, warmth or exercise." *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994). *See e.g., Hamilton v. Lyons*, 74 F.3d 99, 106-

07 (5th Cir. 1996)(pre-trial detainee--deprivation of showers for a three-day period does not state

a claim); *Davenport v. DeRobertis*, 844 F.2d 1310, 1316-17 (7th Cir. 1988)(holding weekly

showers and unlimited access to washbasin constitutionally sufficient).

### *(b).  Cold Temperatures*

The Eighth Amendment requires detention center officials to "take reasonable measures

to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832-33, 114 S. Ct.

1970, 128 L. Ed. 2d 811 (1994).  This includes the right to adequate shelter and "protection from

extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)(In determining whether low

temperatures in cell violate the Eighth Amendment, court should examine severity of the cold,

its duration, whether the prisoner had alternative means to protect himself from the cold, and

whether the prisoner must endure other uncomfortable conditions.  Deliberate indifference

implies at minimum actual knowledge of impending harm easily preventable.).

McCarthy maintains he was subjected to cold temperatures in his cell.  McCarthy

submitted grievances and/or requests asking, among other things, to be placed in general

population instead of administrative segregation, *resp.* at ¶ 20, because he wasn't receiving mail,

*resp.* at ¶ 21, requesting his medical records, *resp.* at ¶ 31, asking that his cell remain unlocked,

*resp.* at ¶ 32, stating he had found an extra blanket, picked up a book off the floor and been given

a pencil by the guard, *resp.* at ¶ 39, and asking for a meatless diet, *resp.* at ¶ 42.  Not a single one

of these grievances or requests mentioned the cold temperature in his cell or his need for

additional heat or additional clothing or bedding because of the cold.  McCarthy was seen by

medical personnel on several occasions but there is no indication in the records that he made any

-21-

complaint about the temperature of his cell.  He had a blanket and a foam mat to sleep on.  *Resp.* at ¶ 58.

When McCarthy was charged with a disciplinary violation on November 17, 2005, after he was found to have concealed items from jail staff, including an extra blanket, he submitted a grievance complaining that other inmates had extra items and had not been put on lock-down. *Resp.* at ¶ 35; *Defts' Ex.* 1 at page 49.  McCarthy did not mention the cold temperature of his cell or his need for an extra blanket.  *Id.*  No genuine issue of material fact exists as to whether an Eighth Amendment claim has been stated with respect to McCarthy's claim that he was subjected to cold cell temperatures.

### (c).  Exercise

A constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs.  *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).  A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened."  *Id.*  Among factors the court should consider in reviewing such a claim are:  (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement.  *Id.*

Here, McCarthy concedes there was adequate room in his cell to do exercises such as push-ups or sit-ups.  *Resp.* at ¶ 61.  However, he contends it was too cold in his cell for him do such exercises.  *Resp.* at ¶ 61.  The fact that McCarthy could exercise in his cell coupled with the fact that he was allowed out of his cell for a short period of time each day does not demonstrate a deprivation sufficiently serious to establish deliberate indifference to McCarthy's

-22-

health or safety.  *Resp.* at ¶ 20 (locked-down 23 ½ hours a day).  *See Rahman X v. Morgan*, 300 F.3d 970, 974 (8th Cir. 2002); *Phillips v.* Norris, 320 F.3d 844, 847 (8th Cir. 2003)(thirty-seven days without being allowed to exercise did not constitute an atypical and significant hardship in the context of normal prison life); *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001)("short-term denials of exercise may be inevitable in the prison context."); *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective custody).  We also note that McCarthy was not continuously incarcerated at the BCDC between February and December of 2005.  Instead, between April 4th and June 24th he was at a different facility.

Additionally, while McCarthy alleges he suffered physical injury as a result of the lack of exercise, the physical injury he identifies is arthritis in his lower back.  *See Resp.* at ¶ 63. McCarthy has offered no medical records that establish he has arthritis in his lower back or that this condition was linked in anyway to the lack of exercise during his incarceration at the BCDC. We note that McCarthy was having problems with his back prior to his incarceration at the BCDC and was treated for back pain.  *Resp.* at ¶ 4 (back surgery eighteen months prior to booking); ¶ 8(C)(listed prescription medication for back upon booking); & ¶ 24 (TENS unit). We believe defendants are entitled to judgment in their favor on this claim.

-23-

### *(d).  Diet*

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health.  *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Eighth Amendment.  Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health.  *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food).

"The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" *Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir. 1998)(expressing doubt that Talib who missed about fifty meals in five months and lost fifteen pounds met this threshold)(*quoting Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)).  "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation."  *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986)(even on a regular permanent basis, two meals a day may be adequate).  *See also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999)(claim that inmate missed eight meals properly dismissed as frivolous); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982)(Eighth Amendment not violated when inmate served only one meal a day for fifteen consecutive days where the one meal was sufficient to maintain normal health).

-24-

In this case, McCarthy has failed to show a genuine issue of material fact exists as to whether his constitutional rights were violated by the diet he was provided while at the BCDC. McCarthy contends he was provided with a low protein diet consisting primarily of cold cuts and received no hot foods. *Resp.* at ¶ 57(C)("Eating nothing but cold-cuts and cold foods is not health[y]."). Although McCarthy denies generally that the diet was adequate, McCarthy has provided nothing other than his vague allegations suggesting that the meals were nutritionally inadequate.

There is no indication his health suffered from the diet he received or that he requested a special diet because of his milk allergy or even informed the medical staff of his milk allergy. While McCarthy does mention stomach problems, he does not attribute the stomach problems to the diet he received. *Resp.* at ¶ 57(C). Furthermore, he had stomach problems when he was booked into the BCDC. *See e.g., Resp.* at ¶ 8(C)(listing Renitidine for his stomach). McCarthy's complaints about the food being served cold or being served food items he either disliked or were in quantities he deemed insufficient are likewise insufficient to state a claim of constitutional dimension. *See e.g., Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)("no evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food."); *Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992)(claim that constitutional rights were violated when he was served cold food was frivolous).

-25-

### *(e).  Verbal Harassment, Threats, and Racial Remarks*

McCarthy generally alleges he was harassed, made fun of, and subjected to verbal abuse by detention center personnel.  Allegations of general harassment, verbal harassment, and abuse do not state claims cognizable under § 1983.  *See e.g., Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997).  *See also Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985)("Verbal threats do not constitute a constitutional violation.").  Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension.  *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim).  We find defendants entitled to summary judgment on this claim.

## CONCLUSION

For the reasons stated, I recommend the defendants' motion for summary judgment (Doc. 20) be granted in part and denied in part.  Specifically, I recommend that the motion be granted with respect to the plaintiff's claims that he was denied adequate medical care and subjected to unconstitutional conditions of confinement.  As noted above, the defendants' failed to brief the issue of whether the plaintiff was denied the opportunity to worship or go to his Bible study

-26-

group.  The motion for summary judgment is therefore denied as to this claim.  Defendants should be directed to advise the court within a specified period of time whether they intend to file a supplemental summary judgment motion on this issue.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of January 2007.


/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-27-